**IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| **RUTH NORTON, Individually and as Executor of THE ESTATE OF JAMES D. NORTON,**<br><br>                    Plaintiffs,<br><br>vs.<br><br>**GREE USA, INC., GREE ELECTRIC APPLIANCES, INC. OF ZHUHAI, HONG KONG GREE ELECTRIC APPLIANCES SALES CO., LTD., MJC AMERICA, LTD. d/b/a SOLEUS INTERNATIONAL, INC., and MJC AMERICA HOLDINGS CO., INC.,**<br><br>                    Defendants. | Case No. <u>4:24-cv-00101</u><br><br><br><br><br><br>**COMPLAINT AND JURY DEMAND** |

**COME NOW** Plaintiffs, Ruth Norton, Individually and as Executor of The Estate of James D. Norton, by and through their attorneys, and for their Complaint against the Defendants state as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      At all times material hereto, Plaintiff Ruth Norton and Decedent James Norton (the "Nortons") were married as husband and wife and were residents of Polk County, Iowa.

2.      Ruth Norton was duly appointed and is the acting Executor of the Estate of James D. Norton in Iowa District Court in and for Polk County.

1

3.      At all times material hereto, Defendant Gree USA, Inc. ("Gree USA") was and is a California corporation, with its principal place of business located at 4195 Chino Hills Parkway #1026 in Chino Hills, California 91709.

4.      At all times material hereto, Gree Electric Appliances Inc. of Zhuhai ("Gree China") was and is a Chinese business entity that most resembles the USA business form of a corporation, with its principal place of business located at Jinji West Qianshan Rd, Zhuhai, Guangdong 519070, CN and is a citizen of the People's Republic of China.

5.      At all times material hereto, Hong Kong Gree Electric Appliance Sales Co., Ltd. ("Gree Hong Kong") was and is a Hong Kong, China business entity that most resembles the USA business form of a corporation, with its principal place of business located at Room 2612 26/F Miramar Tower, 132 Nathan Road, Tsim Sha Tsui, Kowloon, Hong Kong, SAR.

6.      At all times material hereto, Gree Hong Kong was and is a citizen of the People's Republic of China.

7.      At all times material hereto, Gree Hong Kong was and is an alter ego of Gree China.

8.      At all times material hereto, Gree USA was and is the agent of Gree China and Gree Hong Kong for purposes of service of process.

9.      At all times material hereto, Gree China exerted and had control over Gree USA's day-to-day activities, shared the same corporate officers, commingled branding, assumed debts, and exerted other such control.

10.     At all times material hereto, Gree China exerted such control over Gree USA and over Gree Hong Kong as to cause the companies to lose their separate identities.

11.     Service of process upon Gree China and Gree Hong Kong can be accomplished in the United States and without implicating the Hague Convention. The Hague Convention is not implicated when service of process is made in the United States, not abroad.

12.     At all times material hereto, Defendant MJC America, Ltd. d/b/a Soleus International, Inc. ("MJC America") was and is a domestic corporation duly organized and existing under the laws of the State of California with its principal place of business located at 280 S. Lemon Ave. #1507, Walnut, California 91788.

13.     At all times material hereto, Defendant MJC America Holdings Co., Inc. ("MJC Holdings") was and is a privately held corporation incorporated under the laws of the State of California, having its principal place of business located at 20035 E. Walnut Dr. North, City of Industry, CA 91789. Hereinafter, both Defendants MJC America, Ltd. d/b/a Soleus International, Inc. and MJC America Holdings Co., Inc. are referred to collectively as ("MJC") herein.

14.     Upon information and belief, at all times material hereto, MJC America was a minority owner of Gree USA.

15.     Upon information and belief, at all times material hereto, MJC Holdings was a minority owner of Gree USA.

16.     Defendants do substantial business within the State of Iowa, including the marketing, selling, and distribution of the product at issue, each Defendant has purposefully availed itself of the forum.

17.     Defendants each derive substantial revenue from the sale of consumer products including the product at issue, to Iowa consumers and retailers doing substantial

business in Iowa, and each Defendant has sold and shipped into the State of Iowa thousands of products.

18.     The fire and loss that forms the basis of this action and out of which this action arises occurred in Polk County, Iowa and relates to each Defendants' contacts within the State of Iowa, which contacts are significant.

19.     At all times material hereto, Defendants each participated in placing dangerous and defective dehumidifiers ("Defective Gree Humidifiers"), including the dehumidifier that caused the fire in the Plaintiffs' home ("Subject Dehumidifier"), in the stream of commerce, with the expectation that they would be purchased and utilized by consumers in Iowa.

20.     Each of the Defendants is the actual manufacturer of the product at issue, and each is also the apparent manufacturer of the product based on its branding.

21.     Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000. Venue is proper in this Court because the causes of action and events surrounding the loss involve a fire that occurred at a property located in Polk County, Iowa.

22.     Venue in this action is proper in this District Court pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claims herein occurred in this District.

4

## FACTS COMMON TO ALL COUNTS

### Background of Defendants and their Relationship

23.  At all times material hereto, Gree USA was and is engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, importing, and selling certain household appliances including, but not limited to, dehumidifiers for residential use, including the Subject Dehumidifier at issue in this lawsuit.

24.  At all times material hereto, Gree China was and is engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, exporting, and selling certain household appliances including, but not limited to, dehumidifiers for residential use, including the Subject Dehumidifier at issue in this lawsuit.

25.  At all times material hereto, Gree Hong Kong was and is engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, exporting, and selling certain household appliances including, but not limited to, dehumidifiers for residential use, including the Subject Dehumidifier at issue in this lawsuit.

26.  At all times material hereto, MJC America, upon information and belief, was and is engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, importing, and selling certain household appliances including, but not limited to, dehumidifiers for residential use, including the Subject Dehumidifier at issue in this lawsuit.

27.     At all times material hereto, MJC Holdings, upon information and belief, was and is engaged in the business of designing, manufacturing, marketing, branding, advertising, distributing, importing, and selling certain household appliances including, but not limited to, dehumidifiers for residential use, including the Subject Dehumidifier at issue in this lawsuit.

28.     From 2007 to September 2013, Gree China was a large Chinese company that manufactured household appliances ("Gree appliances") for sale in and outside of China, including in the United States. See "Exhibit 1", Statement of Facts ¶ 1.

29.     From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree China that exported Gree appliances to the United States.  See Exhibit 1, Statement of Facts ¶ 2.

30.     From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong. See Exhibit 1, Statement of Facts ¶ 3.

31.     Gree USA sold Gree appliances including the Defective Gree Dehumidifiers that were manufactured by Gree China to retailers in the United States. See Exhibit 1, Statement of Facts ¶ 3.

32.     Those Gree appliances were manufactured by Gree China and imported into the United States by Gree Hong Kong and Gree USA.  See Exhibit 1, Statement of Facts ¶ 3.

33.     On April 23, 2010, MJC, a privately held California-based manufacturer, importer, and distributer of home comfort products, entered into a joint venture agreement

with Gree China to promote the sale of Gree China's products throughout the United States, including Iowa.

34.     Pursuant to the joint venture agreement, MJC transferred its existing customer accounts—which included The Home Depot, Inc., Lowes Companies, Inc., Menard, Inc., BJ's Wholesale Club, Inc., and Sears Corp. – to Gree USA, a corporation formed as part of the joint venture, with 51 percent of its stock owned by Gree Hong Kong and the remaining 49 percent owned by MJC.

35.     The parties agreed that Gree USA would primarily market and sell the products manufactured by Gree China.

36.     Gree USA was a joint venture between Gree Hong Kong and MJC America Holdings Co., Inc.  See Exhibit 1, Statement of Facts ¶ 3.

37.     Gree Hong Kong was the majority owner of Gree USA.  See Exhibit 1, Statement of Facts ¶ 3.

38.     Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO and Chief Administrative Officer ("CAO") were owners of MJC. Gree USA's CEO, CFO, and CAO effectively controlled Gree USA.  See Exhibit 1, Statement of Facts ¶ 3.

39.     From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree China and imported into the United States by Gree Hong Kong.  See Exhibit 1, Statement of Facts ¶ 4.

40.     Gree USA and Gree Hong Kong are the alter egos of Gree China, and all three entities operate as one and the same, with Gree China exerting substantial control over the day-to-day operations of all three entities and with Gree Hong Kong and

7

Gree USA dependent upon Gree China for money, both entities incapable of operating financially without the backing of Gree China.

**The Consumer Product Safety Commission, the
Consumer Product Safety Act, and its Application**

41. The United States Consumer Product Safety Commission (the "CPSC") was created by the Consumer Product Safety Act of 1972 (the "CPSA"). 15 U.S.C§ 2053. See Exhibit 1, Statement of Facts ¶ 6.

42. At all times material hereto, the "CPSC" was and is a federal agency responsible for protecting consumers from dangerous consumer products and is the lead federal agency responsible for the implementation, enforcement, and administration of the CPSA. See Exhibit 1, Statement of Facts ¶ 6.

43. One of the core purposes and law functions of the CPSC is "to protect the public against unreasonable risks of injury associated with consumer products 15 U.S.C § 2051(b)(1).

44. At all times material hereto, the CPSA mandated safety practices and placed certain legal obligations on companies that manufacture, import, distribute, or sell consumer products which includes and applies to the Defendants in this action.

45. The CPSA was created and exists for the primary purpose of keeping American consumers, including Iowans, safe from defective and dangerous products. See Exhibit 1, Statement of Facts ¶ 5.

46. To assist the CPSC's ability to fulfill the function of protecting consumers against unreasonable risk of serious injury or death, the Act requires manufacturers, importers, distributors, and retailers of consumer products to report "immediately"

8

to the CPSC information that reasonably supports the conclusion that a product contains a defect that could create a substantial product hazard or creates an unreasonable risk of serious injury or death.  15 U.S.C§ 2064(b)

### Underwriters Laboratories Standards and Certifications

47.   Underwriters Laboratories ("UL") is an organization formed in 1894 and incorporated in 1906 whose primary purpose and mission is to promote and ensure safe living and working environments in the United States and abroad.

48.   UL has been providing its labeling service to product manufacturers and sellers in the United State since 1906, the purpose of which is to verify and confirm that a product sold in the U.S. meets the current industry testing standards.

49.   At all times material hereto, one of the CPSA's requirements is that certain products meet UL testing standards and are UL certified.

50.   The Subject Dehumidifier was one such product that required UL certification.

### Distribution Scheme for the Defective Dehumidifiers in the U.S.

51.   Between, 2007 and 2013, Gree USA sold more than two million Defective Gree Dehumidifiers in the United States including Iowa, which were manufactured by Gree China and exported/imported by Gree Hong Kong.

52.   The Defective Gree Dehumidifiers had plastic parts that did not meet UL standards as required by the CPSA and were therefore prone to catching fire.

53.   At all times material hereto, including but not necessarily limited to, during 2007 through 2013, Defendants had an obligation to refrain from selling dangerous or Defective Gree Dehumidifiers to United States' citizens including Iowans.

54.  At all times material hereto, including but not necessarily limited to, during 2007 through 2013, Defendants knew that they had an obligation to refrain from selling dangerous or Defective Gree Dehumidifiers to United States' citizens including Iowans.

55.  At all times material hereto, the CPSA required that the Defendants inform the CPSC, about any consumer products regarding which information reasonably supported the conclusion that such product contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death. 15 U.S.C§ 2064(b)

56.  At all times material hereto, the Defendants knew that they had the obligation and were required under the CPSA to inform the CPSC about any consumer product regarding which information reasonably supported the conclusion that such product contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death.

57.  During 2007 through 2013 many fires were reported to Defendants, including but not limited to, by and through their consumers, as being caused by the dangerous and Defective Gree Dehumidifiers sold by Defendants with the substandard plastic parts that were prone to catching fire.

58.  The information about fires being caused by dangerous and Defective Gree Dehumidifiers sold by Defendants with the substandard plastic parts that were prone to catching fire constituted information which reasonably supported the conclusion that such products contained a defect that could create a substantial product hazard or created an unreasonable risk of serious injury or death.

10

59. As such, at all times material hereto, including but not necessarily limited to, during 2007 through 2013, Defendants had an obligation to inform the CPSC of information about the dangerous and Defective Gree Dehumidifiers with substandard plastic parts that were pone to and were catching fire.

60. Despite such information, between 2007 and September of 2013, the Defendants continued to sell and place into the market and stream of commerce in the United States and thus American and Iowan homes purchased the dangerous and Defective Gree Dehumidifiers.

61. Beginning in July of 2012 and continuing until September of 2013, the Defendants gained additional information and had, at least as of that time, actual knowledge that the Defective Gree Dehumidifiers were defective and dangerous, prone to catching fire, were burning down American's homes, and putting American lives in grave danger.

62. For example, in July of 2012 Simon Chu and Charley Loh, two co-owners and officers of MJC America and Gree USA, emailed with each other and other senior executives thereof regarding the serious issues with the Defective Gree Dehumidifiers catching fire.

63. In fact, one such email contained a consumer's video of a burning Defective Gree Dehumidifier.

64. Despite this grave danger, the Defendants focused primarily on the financial threat to the Defendants of a potential product recall and not on the profound and grave danger posed to American consumers including Iowans.

65.     From at least July of 2012 until April 30, 2013, the Defendants continued to receive reports from consumers and insurance companies of the Defective Gree Dehumidifiers catching fire.

66.     Despite the foregoing actual knowledge, the Defendants chose for over a year to continue to sell and place into American and Iowan homes the dangerous and Defective Gree Dehumidifiers that were putting American lives in grave danger.

67.     Despite the foregoing actual knowledge and the affirmative reporting requirements contained in the CPSA, the Defendants chose to withhold such information from the CPSC from at least July of 2012 through September 12, 2013.

68.     Despite the foregoing actual knowledge and the affirmative reporting requirements contained in the CPSA, the Defendants chose to withhold such information from the retail companies that bought the Dangerous Gree Dehumidifiers and resold them to American consumers including Iowans from at least July of 2012 through September 12, 2013.

69.     The Defendants did not stop selling the dangerous and Defective Gree Dehumidifiers until September 12, 2013, more than a year after they learned of the grave danger to American lives.

70.     The Defendants did not issue a recall of the dangerous and Defective Gree Dehumidifiers until September 12, 2013.

71.     Plaintiffs purchased one of the dangerous and Defective Gree Dehumidifiers, and were never notified of any recall, danger, or even any concern with it being a gravely dangerous and Defective Gree Dehumidifier.

72. Plaintiffs used the dangerous and Defective Gree Dehumidifier in their home completely unaware that the Defendants were manufacturing, distributing, selling, and concealing the gravely dangerous and Defective Gree Dehumidifiers.

## Defendants' Falsification of UL Certification

73. From at least January 2008 to late 2013, Defendants designed, manufactured, supplied, distributed, imported, marketed, and sold approximately 2.5 million consumer dehumidifiers throughout the United States including Iowa which were included in a series of recalls initially announced in 2013, expanded in 2013, expanded again in 2014, and re-announced in 2016 (hereinafter the "Recalled Dehumidifiers"). The recalls were based on serious fire hazards associated with the Recalled Dehumidifiers. See "Exhibit 2" which is a compilation of Gree Dehumidifier recalls.

74. As part of its plan to penetrate the U.S. consumer market, Gree China needed a brand name that major U.S. retailers were familiar and comfortable with, so that these retailers would purchase products manufactured by Gree China.

75. On or around 2008, Gree China, for the purpose of increasing sales in the United States and for the purpose of associating itself with a brand familiar to U.S. retailers, approached MJC in California about MJC selling and promoting Gree products to U.S. retailers, including Home Depot, Sears, Lowe's, and other similar retail chains.

76. Starting in 2010, Gree China and MJC agreed to brand dehumidifiers under the name "SoleusAir powered by Gree" as a test case to determine if MJC's Soleus brand could assist Gree China in penetrating the U.S. market.

77.     From January of 2010 until October of 2010, Gree China exported at least 421,000 dehumidifiers bearing the "SoleusAir powered by Gree" brand to MJC in California for distribution to U.S. retailers, including retailers in Iowa.

78.     Gree China and Gree Hong Kong represented to MJC, Gree USA, retailers, and the general public that its dehumidifiers were certified by Underwriter's Laboratory ("UL") and that the design and materials used in the manufacturing of its dehumidifiers complied with UL Standard 474 and Standard 94.

79.     As part of the UL certification process, Gree China and Gree Hong Kong made representations to UL that the plastics used in the construction of its dehumidifiers complied with the fire rating in UL 94.

80.     UL 94 requires that consumer electric products, including dehumidifiers, use plastics that have specific burn and flame rates in order to prevent, reduce, and limit the risk of fire hazards.

81.     In its application for UL certification under UL 474, Gree China represented that the materials and plastics used to manufacture and construct its dehumidifiers were compliant with UL 94.

82.     The representations that the materials and plastics used to manufacture and construct the dehumidifiers were compliant with UL 94 were false.

83.     The Defendants knew that the representations that the materials and plastics used to manufacture and construct the dehumidifiers in compliance with UL 94 were false representations.

84.     Gree China and Gree Hong Kong made these false and misleading representations while knowing that the materials and plastics used to manufacture and construct its dehumidifiers were not compliant with UL 94's burn and flame rate requirements.

85.     Gree China and Gree Hong Kong made these false and misleading representations knowing that UL was unable to independently conduct the burn/flame resistance testing set forth in UL 94, and UL relied on Gree China's representations in the certification documents stating that Gree China had these tests performed and the dehumidifiers complied with UL 94.

86.     At all times material hereto, U.S. retailers would not purchase and sell dehumidifiers that are not certified by UL.

87.     The Defendants knew that U.S. retailers would not purchase and sell dehumidifiers that are not certified by UL.

88.     At all times material hereto, U.S. consumers would not and could not purchase dehumidifiers that were not certified by UL because U.S. retailers would not purchase or sell non-UL listed electric products.

89.     The Defendants knew that U.S. consumers would not and could not purchase dehumidifiers that were not certified by UL because U.S. retailers would not purchase or sell non-UL listed electric products.

90.     Gree China's and Gree Hong Kong's falsification of the UL Certification process was done for the purposes of misleading UL into improperly certifying the dehumidifiers and, in so doing, Gree China and Gree Hong Kong defrauded and misled U.S. retailers and consumers into purchasing its dehumidifiers on the false

belief that the dehumidifiers were designed and manufactured in compliance with UL standards.

91.    Although the Defendants knew that the Recalled Dehumidifiers were not compliant with UL flammability standards, they sold, marketed, offered for sale, distributed in commerce, exported, and imported the dehumidifiers bearing the UL mark, with the specific intent to defraud consumers, including the Nortons and their family members.

92.    From 2008 until the present time, Gree China was an original equipment manufacturer for General Electric ("GE") branded dehumidifiers.

93.    In late 2010, GE instructed Gree China to make certain design changes and product improvements to GE branded Gree China manufactured dehumidifiers.

94.    The design changes were mandated by GE due to product failure issues with the dehumidifiers, including the same overheating issues and fires that occurred with the "SoleusAir powered by Gree" dehumidifiers and the Subject Dehumidifier.

95.    The GE mandated design changes required a) the removal of electrical terminal sleeves that used PVC materials; b) the use of UL 94 V0 rated plastics for structural components of the dehumidifiers, including the fan shroud base, center support, and external cabinet; and c) the use of UL 94 flammability rated materials for the terminal cover.

96.    Starting in its January 2011 production run, Gree China made the above requested changes for GE dehumidifiers only.

97.    Gree China did not make the GE mandated design changes for dehumidifiers manufactured under other brand names, including the dehumidifiers that it was

manufacturing and selling to Gree USA and MJC, including but not limited to the Subject Dehumidifier.

98.     Gree China did not make the GE mandated design changes despite actual knowledge that the design and material defects identified by GE were causing Gree China's dehumidifiers to fail, overheat, and catch on fire.

99.     Since January of 2011, Gree China manufactured and sold approximately 1,400,000 dehumidifiers to Gree USA and MJC in California that Gree China and the other Defendants knew were defective because they did not incorporate the GE mandated design and materials changes.

100.    The majority owner of Gree USA is Gree Hong Kong, a wholly owned subsidiary of Gree China.

101.    The common Officers and Directors of Gree China and Gree USA knew that the dehumidifiers were not compliant with UL standards as they had approved the GE design changes and they also approved the continued manufacture and sale of dehumidifiers for other brands without the GE mandated design changes.

**The Indictments**

102.    On or about October 26, 2021, Gree China, Gree Hong Kong, and Gree USA were indicted criminally in United States District Court for the Central District of California in Case No. 2:21-cr-00498 as is set forth in more detail below. See "Exhibit 3" which is the filed "Information" of all allegations against the Defendants.

103.    Thereafter, Gree China and Gree Hong Kong, entered into a valid and enforceable Deferred Prosecution Agreement addressing such charges. See "Exhibit 4" which

is the filed "Deferred Prosecution Agreement for Defendants Gree Electric Appliances, Inc. of Zhuhai and Hong Kong Gree Electric Appliances Sales Co., LTD."

104. Gree USA pleaded guilty to Failure to Furnish Information Required by 15 U.S.C. § 2064(b) (3) and (4) in violation of the CPSA, Title 15, United States Code, Sections 2068 (a) (4) and 2070. See "Exhibit 5" which is the filed "Plea Agreement for Defendant Gree USA, Inc."

105. In the Deferred Prosecution Agreement, Gree China and Gree Hong Kong admitted to the unqualified truth and accuracy of the Statement of Facts incorporated by reference, as "Exhibit 1" herein and referred to as Exhibit B in the Agreement, and that such facts were sufficient to support a conviction and prove their guilt to the charges described therein. See "Exhibit 1" which is titled Exhibit B that is included in the Deferred Prosecution Agreement and "Exhibit 4" ¶ 30 on Page 19.

106. In its Plea Agreement, Gree USA admitted that it was in fact guilty of the offense to which it was pleading as set forth above therein in Paragraph 21 of Exhibit 5 and admitted to the unqualified truth and accuracy of the Statement of Facts incorporated by reference as Exhibit B to its Plea Agreement, which is the same document as the Statement of Facts incorporated by reference as Exhibit B to the Deferred Prosecution Agreement. See "Exhibits 1, 4, and 5" which all contain "Exhibit B – Statement of Facts".

107. As an enforceable and material term of both to the Deferred Prosecution Agreement, Gree China and Gree Hong Kong stated and expressly agreed as follows:

18

Gree Zhuhai (herein "Gree China") and Gree Hong Kong agree that: "they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

See "Exhibit 4" ¶ 42 on Pages 27, 28.

108.    Any statement in any legal pleading filed in this present action made by the Defendants constitutes a "public statement in litigation or otherwise" by Gree China and Gree Hong Kong as described therein.

109.    According to the foregoing, **<u>ANY</u>** denial or qualification whatsoever other than an unqualified admission to Paragraphs 111-160 below would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein.  See "Exhibit 4" ¶ 42 on Pages 27, 28.

### The Cover Up

110.    The following Paragraphs 111 through and including 160 herein detail the background and coverup leading to the death of Plaintiff James Norton and are verbatim quotes from the Statement of Facts regarding Gree China, Gree Hong Kong, and Gree USA that have expressly been adopted and admitted as true and correct without qualification, subject to the penalties set forth in the Breach of Agreement subsection of the Deferred Prosecution and Plea Agreements as well as to subsequent additional federal prosecution for its admittedly criminal and wrongful conduct.  See "Exhibit 4" ¶¶ 37-41, Pages 22-27.

### THE GREE COMPANIES

111.   *From 2007 to September 2013, Gree Zhuhai was a large Chinese company that manufactured household appliances ("Gree appliances") for sale in and outside of China, including in the United States. Exhibit 4 ¶ 1 (Exhibit B starts on Page 51).*

112.   *From 2007 to September 2013, Gree Hong Kong was a Chinese subsidiary of Gree Zhuhai that exported Gree appliances to the United States. See Exhibit 4 ¶ 2.*

113.   *From 2010 to September 2013, Gree USA was a California corporation with offices in City of Industry, California, and a subsidiary of Gree Hong Kong.   Gree USA sold Gree appliances to retailers in the United States.   Those Gree appliances were manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong and Gree USA.   Gree USA was a joint venture between Gree Hong Kong and another company, MJC America Holdings Co., Inc. ("MJC America Holdings"). Gree Hong Kong was the majority owner of Gree USA.   Gree USA's Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), who was the brother of Gree USA's CEO, and Chief Administrative Officer ("CAO") were owners of MJC America Holdings. Gree USA's CEO, CFO and CAO effectively controlled Gree USA. Exhibit 4 ¶ 3.*

114.   *From 2010 to September 2013, Gree USA sold in the United States dehumidifiers manufactured by Gree Zhuhai and imported into the United States by Gree Hong Kong ("Gree dehumidifiers"). Exhibit 4 ¶ 4.*

### THE CONSUMER PRODUCT SAFETY COMMISSION
### AND THE CONSUMER PRODUCT SAFETY ACT

115. *The Consumer Product Safety Act (the "CPSA") was enacted to protect the public from dangerous consumer products. Exhibit 4 ¶ 5.*

116. *The United States Consumer Product Safety Commission (the "CPSC") is the federal agency responsible for protecting consumers from dangerous consumer products and is the lead federal agency responsible for the implementation, enforcement, and administration of the CPSA.   The CPSC can order mandatory recalls of dangerous products. Exhibit 4 ¶ 6.*

117. *The CPSA requires companies that manufacture, import, distribute, or sell consumer products to inform the CPSC, among other things, about any consumer product about which information reasonably supports the conclusion that such product contains a defect that could create a substantial product hazard, or creates an unreasonable risk of serious injury or death. This duty to report also applies to the individual directors, officers, and agents of those companies. A company's or an individual's knowing and willful failure to report an unsafe product to the CPSC is punishable as a felony violation of the CPSA. Exhibit 4 ¶ 7.*

### THE GREE COMPANIES LEARN THAT THEIR DEHUMIDIFIERS
### ARE CATCHING FIRE

118. *On or about July 26, 2012, the CEO of Gree USA saw a video of a burning Gree dehumidifier. On July 26, 2012, Gree USA's CEO sent the video to a Gree Hong Kong manager ("Gree Hong Kong Manager #1"), who was also a director of Gree Hong Kong and in charge of exporting Gree appliances for sale in the United States, copying other Gree USA employees and a Gree Zhuhai employee. In sending*

the video, Gree USA's CEO labeled the email "urgent," and said that the video was "scarey [sic] to just watch" and a "very serious issue with GREE product quality." Gree USA's CEO also stated that the video was the third reported instance of a Gree appliance catching fire since on or about June 2012 and that it could lead to lawsuits against Gree USA as well as a recall costing millions of dollars. Gree USA's CEO knew that the Gree Companies had an obligation to inform the CPSC immediately of any consumer product that contained a defect creating a substantial product hazard or that created an unreasonable risk of serious injury or death. Exhibit 4 ¶ 8.

119.  Gree Hong Kong Manager #1, replied to the July 26, 2012 email from Gree USA's CEO that same day.   In his reply email, Gree Hong Kong Manager #1 said that "[w]e also felt shock when we watched the video[,]" and that he had sent the video to Gree Zhuhai's Quality Department and to Gree Zhuhai's chief engineer who was also its senior vice president for research and development. Exhibit 4 ¶ 9.

## THE GREE COMPANIES LEARN THAT TWO DEFECTS IN THEIR DEHUMIDIFIERS ARE CAUSING THEM TO CATCH FIRE

120.  During August 2012, Gree USA and Gree Zhuhai employees, engineers and officers investigated the Gree dehumidifiers for potential defects that could cause them to catch fire.   No employee of Gree USA or Gree Zhuhai informed the CPSC of a defect or risk associated with the Gree dehumidifiers in August 2012. Exhibit 4 ¶ 10.

121.  On September 4, 2012, Gree USA's CEO emailed Gree Hong Kong Manager #1 about the Gree dehumidifiers.   The CEO stated that Gree USA had tested its dehumidifier inventory in Gree USA's warehouse and the testing showed that these

*dehumidifiers burned.  The CEO stated "the result is not like what you have told us" regarding how many units were involved because "the result shows the units all can catch the fire and apparently the material is not according to UL standard! I don't think the factory is telling us the fact and truth. . . ."  The CEO stated that, because of Gree USA's test results, he would have the dehumidifiers further tested for compliance with UL (formerly Underwriters Laboratory) standards and was planning to inform the CPSC about the Gree dehumidifiers. Exhibit 4 ¶ 11.*

122.  *On September 5, 2012, Gree Hong Kong Manager #1 emailed Gree USA's CEO instructing "Gree USA to resolve the claim and CPSC case" and stating that Gree Zhuhai would "fully indemnify Gree USA for any expense and responsibility."  That same day, Gree USA's CEO replied and requested more details regarding who would pay the costs that could result from the Gree dehumidifiers and when they would pay, and offered to handle reporting the Gree dehumidifiers to the CPSC if Gree Zhuhai would agree to pay all future costs related to the dehumidifiers' defects.  Gree Hong Kong Manager #1 replied on September 6, 2012, stating that they were willing to agree to compensate expenses in a timely manner and that Gree USA "would be the single entity to reply insurance company and CPSC, [and] we will provide the necessary supports of test records and technical information if you need any."After these communications, no one from the Gree Companies informed the CPSC about the Gree dehumidifiers or their defects. Exhibit 4 ¶ 12.*

123.  *On September 10, 2012, Gree USA's CEO emailed the highest-ranking person at Gree Zhuhai, the chairperson of Gree Zhuhai's board who also served as Gree Zhuhai's President and CEO, copying no one else from Gree Zhuhai or Gree Hong*

Kong.   In this email, Gree USA's CEO stated that "GREE headquarters" had told him not to report the Gree dehumidifiers to the CPSC.   Specifically, the Gree USA CEO stated that "GREE headquarters" had told him not to report that the Gree dehumidifiers may be defective and catch on fire and that they might have overheating parts and plastic parts that could burn because the plastic did not meet the UL standard for fire resistance.   Gree USA's CEO warned in his email that any company or individual who withheld from the CPSC information about a dangerous product could face severe punishment, including criminal prosecution.   Gree USA's CEO asked how Gree Zhuhai would pay future costs related to the Gree dehumidifiers, including any potential harm to MJC America Ltd. ("MJC America"), a company owned by Gree USA's CEO, CFO and CAO which also sold the defective Gree dehumidifiers.   Gree USA's CEO stated that if Gree Zhuhai did not give him clear instructions on how to handle the Gree dehumidifiers within a matter of days, then he would inform the CPSC about the dehumidifiers.   No one replied to this email. Exhibit 4 ¶ 13.

124.   On September 13, 2012, Gree USA's CEO sent another email to Gree Hong Kong Manager #1.   In this email, Gree USA's CEO discussed how a recall of the defective Gree dehumidifiers might be handled and attached the CPSC's "Recall Handbook." Gree USA's CEO also discussed the financial costs and lost sales that could result from a recall.   He did not express any consideration or concern about how defective Gree dehumidifiers could harm consumers.   Gree USA's CEO asked Gree Hong Kong Manager #1 to forward this email to Gree Zhuhai's chief engineer. Exhibit 4 ¶ 14.

24

125.   *On September 19, 2012, Gree Hong Kong Manager #1 came to Gree USA's offices in City of Industry, California, to meet with Gree USA's CEO.   A Gree Zhuhai engineer and three other Gree USA officers also participated in the meeting.   This meeting was audio recorded by agreement. Exhibit 4 ¶ 15.*

126.   *At this September 19 meeting, Gree Hong Kong Manager #1 stated that Gree Zhuhai's testing of the Gree dehumidifiers was not able to reproduce the reported fire, but had revealed two defects: (1) the dehumidifiers used plastics that did not meet UL standards for fire resistance; and (2) electrical arcing caused by the dehumidifiers' compressors overheating could burn the non-UL standard plastic used in these dehumidifiers.   The Gree Zhuhai engineer at the meeting also discussed these defects.   Gree Hong Kong Manager #1 stated that he was aware of at least five consumer reports of Gree dehumidifiers overheating and catching fire but that Gree Zhuhai "still believe[d] that the fire case is a relatively isolated case … associated with atrocious conditions."   He also stated that Gree Zhuhai would modify the manufacture of all future dehumidifiers to fix this problem so they would not catch fire. Exhibit 4 ¶ 16.*

### THE GREE COMPANIES DECIDE TO DELAY REPORTING AND RECALLING THEIR DEFECTIVE DEHUMIDIFIERS

127.   *At this same September 19 meeting, Gree Hong Kong Manager #1 said that the meeting participants' decisions on what to do about the Gree dehumidifiers should be guided by the principle of minimizing the costs and loss of reputation to the Gree Companies. Gree Hong Kong Manager #1 said that Gree Zhuhai wanted to delay any recall of the dehumidifiers for 6 to 9 months because delaying a recall would*

*reduce the recall's effect on Gree dehumidifier sales. Gree Hong Kong Manager #1 stated that an immediate recall would have a significant, and negative, effect on 2012 and 2013 Gree dehumidifier sales.  Gree Hong Kong Manager #1 stated that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent Gree dehumidifiers from overheating and catching fire, and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012. Exhibit 4 ¶ 17.*

128.  *In response to what Gree Hong Kong Manager #1 said, Gree USA's CEO said at the meeting that the Gree dehumidifiers' defects were very significant and had important legal implications.  But the Gree USA CEO did not push to inform the CPSC of the dehumidifiers. Rather, Gree USA's CEO recommended only that the Gree Companies have another company test the Gree dehumidifiers and then decide whether to delay the recall.  Gree Hong Kong Manager #1 responded by urging the Gree USA officers not to conduct such a test of the Gree dehumidifiers because that test would show that the dehumidifiers used plastic that did not meet UL standards for fire resistance. Gree USA's CEO said that the Gree USA officers understood what Gree Zhuhai was asking them to do and needed time to think before making a decision about how to proceed. Exhibit 4 ¶ 18.*

129.  *Two days after the September 19, 2012 meeting, Gree USA's CEO sent an email to Gree Zhuhai's chief engineer and copied the email to Gree Zhuhai's board chairperson.  In his September 21, 2012 email, Gree USA's CEO said that he understood that Gree Zhuhai wanted to delay a recall of the Gree dehumidifiers for 6 to 9 months.  Gree USA's CEO also said that he thought that the Gree*

*dehumidifiers were still likely to catch fire, and that, after careful consideration, Gree USA's officers had decided to report the Gree dehumidifiers to the United States government. Exhibit 4 ¶ 19.*

130. *The next day, Gree Zhuhai's chief engineer replied to the September 21, 2012 email from Gree USA's CEO without copying Gree Zhuhai's board chairperson. In his September 22, 2012 email, Gree Zhuhai's chief engineer said that Gree Zhuhai had clearly expressed its opinion about how to handle the defective Gree dehumidifiers, and that he hoped Gree USA's CEO would follow that opinion.  Gree Zhuhai's chief engineer said that he had no authority to approve what Gree USA's CEO proposed in his September 21, 2012 email and that he hoped Gree USA's CEO would report his decision on how to handle the defective Gree dehumidifiers to Gree Zhuhai's board chairperson and listen to her opinion. Exhibit 4 ¶ 20.*

131. *On September 28, 2012, Gree USA's CEO sent an email to Gree Zhuhai's board chairperson, copying no one else from Gree Zhuhai or Gree Hong Kong.  In his email, Gree USA's CEO stated again that Gree's dehumidifiers had two known defects: (1) the compressors in the dehumidifiers could overheat; and (2) the plastic in the dehumidifiers did not meet UL standards for fire resistance, meaning that the plastic would burn when overheated.  Gree USA's CEO said that it was known that these two defects could cause the dehumidifiers to catch fire and that there were numerous consumer complaints about the dehumidifiers in fact catching fire.  Gree USA's CEO also said that the Gree Companies had sold millions of these defective dehumidifiers.  Gree USA's CEO further related that he believed the Gree Companies should recall the dehumidifiers and warn consumers that using them*

27

*could result in personal injuries and property damage, but that Gree Zhuhai had not agreed to a recall. Gree USA's CEO warned that a recall could cost hundreds of millions of dollars, would harm the reputation of Gree products, and would reduce the Gree Companies' market share.   But Gree USA's CEO also warned that if Gree Zhuhai did not reach an agreement with Gree USA on the recall of the dehumidifiers, then Gree USA unilaterally would report the Gree dehumidifiers to the United States government. Gree USA's CEO concluded his email by saying that this was a very important and urgent matter.   Neither Gree Zhuhai's board chairperson nor anyone else at Gree Zhuhai replied to this email. Exhibit 4 ¶ 21.*

132.   *Despite the Gree USA's CEO's September 4, 10, 21, and 28, 2012 emails, no employee of the Gree Companies reported the Gree dehumidifiers' defects or risks, or the known consumer complaints of fires related to the dehumidifiers, to the CPSC in September 2012. Exhibit 4 ¶ 22.*

133.   *In September 2012, Gree USA sold at least 24,999 defective Gree dehumidifiers to retailers in the United States for approximately $2,558,019. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 23.*

### THE GREE COMPANIES CONTINUE TO SELL THEIR
### DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES
### WITHOUT REPORTING THEM TO THE CPSC

134. *On October 19, 2012, a sales representative for Gree USA met in person with Gree Zhuhai's board chairperson in China.  During this meeting, the sales representative discussed the defective Gree dehumidifiers with Gree Zhuhai's board chairperson. Gree Zhuhai's board chairperson said that she would send a new Gree Hong Kong manager ("Gree Hong Kong Manager #2") to the United States to address the problems associated with the dehumidifiers. Exhibit 4 ¶ 24.*

135. *In October 2012, Gree USA sent to Gree Zhuhai new consumer reports of fires related to the Gree dehumidifiers. These reports contradicted Gree Hong Kong Manager #1's statements at the September 19 meeting that a recall could be delayed 6 to 9 months because cooler fall and winter temperatures would help prevent dehumidifiers from overheating and catching fire and that there should be very few, if any, dehumidifier fires in the 6 to 9 months following September 2012.  Despite these new consumer reports of fires caused by Gree dehumidifiers, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects or risks in October 2012. Exhibit 4 ¶ 25.*

136. *In October 2012, Gree USA sold at least 2,938 defective Gree dehumidifiers to retailers in the United States for approximately $429,426. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated.   The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO,*

*CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 26.*

## THE GREE COMPANIES RECEIVE ANOTHER TEST REPORT SHOWING THAT THEIR DEHUMIDIFIERS ARE DEFECTIVE AND DANGEROUS

137.  *In late October 2012, Gree USA sent two Gree dehumidifiers to an independent testing company for testing.   On November 5, 2012, the testing company wrote a report confirming and reiterating that the Gree dehumidifiers were defective because the compressors in the dehumidifiers could run continuously and thereby overheat to an "extreme high temperature." Gree USA's CEO received this report on  November 6, 2012. Gree USA's CEO immediately sent the report to Gree Hong Kong Manager #2, who had taken over responsibility for the importation and sale of the Gree dehumidifiers in the United States from Gree Hong Kong Manager #1. Exhibit 4 ¶ 27.*

## THE GREE COMPANIES CONTINUE TO SELL THEIR DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES WITHOUT REPORTING THEM TO THE CPSC

138.  *At the end of November 2012, Gree USA's CEO told Gree Hong Kong Manager #2 that an attorney advised him to inform the CPSC immediately of all consumer reports of fires related to the Gree dehumidifiers.  Despite this legal advice and the November 5, 2012 test report reiterating that the Gree dehumidifiers were dangerously defective, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in November 2012. Exhibit 4 ¶ 28.*

139.   *In November 2012, Gree USA sold at least 6,817 defective Gree dehumidifiers to retailers in the United States for approximately $792,067. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 29.*

<u>THE GREE COMPANIES HAVE YET ANOTHER MEETING</u>
<u>TO DISCUSS THEIR DEFECTIVE DEHUMIDIFIERS BUT STILL</u>
<u>DO NOT INFORM THE CPSC</u>

140.   *On December 18, 2012, Gree USA's CEO and another Gree USA officer went with an attorney to Hong Kong to meet with Gree Hong Kong Manager #2, a Gree Zhuhai engineer, Gree Zhuhai's Chief Financial Officer ("CFO") and three attorneys representing Gree Zhuhai. At this meeting, Gree USA's CEO discussed the November 5, 2012 test report with Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO.  Gree Hong Kong Manager #2, the Gree Zhuhai engineer and the Gree Zhuhai CFO told Gree USA's CEO that Gree Zhuhai would test the Gree dehumidifiers and let him know the results of their testing. Exhibit 4 ¶ 30.*

141.   *No employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in December 2012. Exhibit 4 ¶ 31.*

142.   *In December 2012, Gree USA sold at least 1,395 defective Gree dehumidifiers to retailers in the United States for approximately $201,835. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not*

*burn when overheated. The Gree Companies knew that Gree USA represented to its*

*retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO*

*and CAO knew that Gree USA's representations that these Gree dehumidifiers met*

*all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 32.*

<u>THE GREE COMPANIES DECIDE TO KEEP SELLING THEIR
DEFECTIVE DEHUMIDIFIERS IN THE UNITED STATES
WITHOUT REPORTING THEM TO THE CPSC</u>

143.    *On January 23, 2013, a Gree USA officer sent an email to Gree Hong Kong*

*Manager #2. The email stated that Gree USA's and MJC America's insurance*

*company suggested that Gree USA report the Gree dehumidifiers to the CPSC and*

*recall all of the defective Gree dehumidifiers. The email also stated that the*

*insurance company "wanted to know if any actions were taken to test the product*

*design in case it is defective" and was told that "the product was submitted to*

*several different testing and no faulty [sic] in the design was found[,] also that new*

*production has an extra protection[.]"   The Gree USA officer further reported in*

*her email that Gree USA had received a new consumer report of a dehumidifier fire*

*and asked how Gree USA should handle this report. Exhibit 4 ¶ 33.*

144.    *Also on January 23, 2013, Gree Zhuhai told Gree USA in writing that it had tested*

*its dehumidifiers and that they were not defective and could be sold in the United*

*States.   Gree Zhuhai did not provide Gree USA with any details on its testing or*

*explain the inconsistency in its test results with those of all prior tests of the Gree*

*dehumidifiers. Exhibit 4 ¶ 34.*

145.    *Despite the recommendation of Gree USA's insurance company to report the Gree*

*dehumidifiers to the CPSC and recall the defective Gree dehumidifiers, and the new*

*consumer report of fire, no employee of the Gree Companies informed the CPSC about the dehumidifiers' defects, risks, or reported fires in January or February 2013. Exhibit 4 ¶ 35.*

146.    *Gree USA sold at least 7,609 and 29,857 defective Gree dehumidifiers in January and February 2013, respectively, to retailers in the United States for approximately $905,291, and $3,255,542, respectively. The Gree Companies knew that the retailers wanted dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 36.*

<u>THE GREE COMPANIES FINALLY REPORT THEIR DEFECTIVE
DEHUMIDIFIERS TO THE CPSC BUT CONTINUE TO SELL
THOSE DEHUMIDIFIERS IN THE UNITED STATES</u>

147.    *On March 14, 2013, Gree USA, Gree Zhuhai, and MJC America made an initial report to the CPSC about their dehumidifiers. The initial report stated that they had sold approximately 1.6 million Gree dehumidifiers in the United States since 2010, and that consumers who had purchased those dehumidifiers had reported fires, overheating, smoke, odors, and property damage related to these dehumidifiers. The initial report did not mention the defects in the Gree dehumidifiers that caused the dehumidifiers to burn. Exhibit 4 ¶ 37.*

148.    *Gree USA sold at least 6,025 and 7,596 defective Gree dehumidifiers in March and April 2013, respectively, to retailers in the United States for approximately $571,702 and $799,244, respectively. The Gree Companies knew that the retailers wanted*

*dehumidifiers that met all UL standards and did not burn when overheated. The Gree Companies knew that Gree USA represented to its retailers that the Gree dehumidifiers met all UL standards. Gree USA's CEO, CFO and CAO knew that Gree USA's representations that these Gree dehumidifiers met all UL standards were false when these dehumidifiers were sold. Exhibit 4 ¶ 38.*

149.   *On April 23, 2013, the Chief Administrative Officer of Gree USA received an independent test report showing that the plastic used in four Gree dehumidifiers made in 2010, 2011, and 2012 did not meet UL standards for fire resistance. Exhibit 4 ¶ 39.*

150.   *On April 30, 2013, Gree USA, Gree Zhuhai, and MJC America made a second, more comprehensive report to the CPSC about their defective Gree dehumidifiers. This report stated that Gree USA, Gree Zhuhai, and MJC America sold approximately 1.84 million of the Gree dehumidifiers and that they had not concluded that these Gree dehumidifiers posed a substantial product hazard or that the dehumidifiers needed to be recalled.   This report listed nineteen known consumer reports of fires involving Gree dehumidifiers with all but one of the fires occurring between June 14, 2012 and April 15, 2013. Exhibit 4 ¶ 40.*

151.   *After their April 30, 2013 report to the CPSC, the Gree Companies continued to receive consumer reports of fires caused by Gree dehumidifiers. Exhibit 4 ¶ 41.*

152.   *The Gree Companies received at least $9,500,000 from the distribution and wholesale of defective Gree dehumidifiers from September 2012 through April 2013. Additionally, the Gree Companies received at least $29,500,000 from the*

*distribution and wholesale of other non-defective Gree dehumidifiers from September 2012 through April 2013. Exhibit 4 ¶ 42.*

153. *United States consumers lost at least $17,400,000 by purchasing defective and dangerous Gree dehumidifiers manufactured, distributed, or sold by the Gree Companies from September 2012 through April 2013. Exhibit 4 ¶ 43.*

154. *From September 2012 to April 2013, United States consumers sustained at least $2,100,000 worth of property damaged or destroyed in fires caused by the defective Gree dehumidifiers.  Exhibit 4 ¶ 44.*

### *THE GREE COMPANIES IMPORTED THEIR DEFECTIVE DEHUMIDIFIERS WITH FALSE UL CERTIFICATIONS*

155. *Between 2010 and at least until September 2012, the Gree Companies imported into the United States Gree dehumidifiers with certifications that the dehumidifiers met all UL standards, when in fact the dehumidifiers did not meet UL standards.  Exhibit 4 ¶ 45.*

### *THE GREE COMPANIES FINALLY RECALL THEIR DEFECTIVE DEHUMIDIFIERS*

156. *By mid-July 2013, Gree Zhuhai decided to recall its defective Gree dehumidifiers and notified the CPSC of this decision. After making this decision, Gree Zhuhai started to plan for the recall.  Exhibit 4 ¶ 46.*

157. *On September 12, 2013, Gree Zhuhai and the CPSC announced a voluntary recall of 2.2 million Gree dehumidifiers in the United States. Exhibit 4 ¶ 47.*

158. *Despite its recall, Gree Zhuhai has received hundreds of consumer reports of fires and overheating caused by defective Gree dehumidifiers. Consumers have reported*

*more than 2,000 incidents involving Gree dehumidifiers, including 450 fires and more than $19,000,000 in property damage. Exhibit 4 ¶ 48.*

159. *No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. Exhibit 4 ¶ 49.*

160. *As a result of the Gree Companies' failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission, the Gree Companies were able to continue to distribute and wholesale their dehumidifiers, including defective Gree dehumidifiers, from September 2012 through April 2013, and received more than $39,000,000 in proceeds from this distribution and wholesale of Gree dehumidifiers. For purposes of forfeiture, the approximately $39,000,000 that the Gree Companies received are assets associated with their failure to report immediately their defective Gree dehumidifiers to the United States Consumer Product Safety Commission in violation of 15 U.S.C. §§ 2068(a)(4) and 2070. Exhibit 4 ¶ 50.*

**The Fire**

161. Prior to July 10, 2022, the Nortons had purchased, owned, and used the Subject Dehumidifier, which was one of the dangerous and Defective Gree Dehumidifiers, in their home.

162. The Subject Dehumidifier was designed, manufactured, supplied, distributed, marketed, advertised, and sold by the Defendants.

163. The Nortons' use of the Subject Dehumidifier in the State of Iowa was in the manner intended at their residence, a residential dwelling, and reasonably foreseeable to the Defendants.

164. On or about the early morning hours of July 10, 2022, shortly before 2:40 a.m., the Subject Dehumidifier caught fire in the basement of the Nortons' home, below the bedroom where they were sleeping.

165. At or about the same time, date, and location, Ruth Norton awoke to the sound of the fire alarms going off in her home.

166. Her husband, James, got out of bed and attempted to turn on the lights so that he and Ruth could see to exit the room and flee the fire.

167. The lights were not working, likely due to the loss of electricity from the fire, and the room was filling with smoke.

168. Ruth got out of bed and was able to find her husband and place her hand on his shoulder, despite the growing lack of visibility in the room.

169. James was trying to save his wife and lead her out the door and to safety, however the smoke was too much and overcame them.

170.   Ruth began to choke and instinctively retreated to the bedroom window and opened it so she could breathe.

171.   Ruth did not know at the time she removed her hand from her husband's shoulder who was valiantly attempting to save her life, that it was the last time she would ever touch him while he lived and breathed.

172.   She began screaming for help from the window.

173.   A neighbor who happened to be camping in his back yard with his family, heard her screams, ran over to assist, and helped Ruth out of the window.

174.   James was not so fortunate and on or about the same time, date, and location, James succumbed to the smoke, heat, and/or fire and died as a result thereof.

175.   Ruth never again saw him alive after she was rescued.

176.   An investigation was conducted by the Altoona Fire Department and Police Department.

177.   The investigation determined that the fire was accidental in nature, originating in the immediate vicinity and likely as a direct result of the dangerous and Subject Dehumidifier.

**Dehumidifiers Finally Recalled by Defendants**

178.   On September 12, 2013, after more than 471 fires and approximately $2,725,000 in property damage, Defendants, along with the CPSC, finally announced a recall on approximately 2.2 million dangerous and Defective Gree Dehumidifiers distributed and sold in the U.S. from January 2005 through August 2013 because of fire and burn hazards. See "Exhibit 2".

179.   More than a full year prior to the recall date, the Defendants were each aware of the dangerous defects with the Defective Gree Dehumidifiers. Despite this actual knowledge, each of the Defendants failed to ask retailers to issue a "stop sale" of the products until June 2013.

180.   Even then, not all retailers were notified.

181.   After the September 12, 2013 recall, Defendants issued press releases downplaying the severity of the recall.

182.   On January 30, 2014, the recall was expanded to include 350,000 GE-brand dehumidifiers that had been manufactured by Gree China and sold by Gree China between January of 2008 and December of 2010.

183.   The recall was re-announced on May 15, 2014 due to a significant increase in the number of overheating events and fires caused by the Defective Gree Dehumidifiers.

184.   In the months between September of 2013 and May of 2014, the number of overheating dehumidifiers increased from 171 to 471 and the number of fires almost tripled from 46 to 121.

185.   The recalls of Defective Gree Dehumidifiers, including the Subject Dehumidifier at issue in this lawsuit, were based on serious fire and burn hazards which subjected the American public, including Iowa consumers, to grave danger including death from the recalled Defective Gree Dehumidifiers.

186.   Although each and every one of the Defendants knew that the recalled Defective Gree Dehumidifiers were not compliant with UL flammability standards, they

nonetheless designed, manufactured, sold, offered for sale, distributed in commerce, advertised, marketed, and imported dehumidifiers bearing the UL mark.

187. On November 29, 2016, more than four years after becoming aware of the hazards associated with their dehumidifiers, and after more than 450 fires, 2,000 reported incidents of dehumidifiers overheating, and nearly $20,000,000 in property damage, Gree, along with the CPSC, announced a recall of approximately 2.5 million dehumidifiers distributed and sold in the U.S. from January 2005 through August 2013 because of serious fire and burn hazards which subjected the American public, including Iowa consumers, to grave danger including death.

188. The Subject Dehumidifier was included as part of the recalls.

189. At the time the Subject Dehumidifier was purchased, the Defendants had actual knowledge that it was defective, but they failed to properly act to stop its sale and to alert retailers and consumers.

190. As a result of the failure to timely recall, provide sufficient notification thereof, and issue a stop sale, the Nortons purchased and used the Defective Gree Dehumidifier which caught their house on fire and caused the untimely death of James Norton.

191. None of the actions taken by the Defendants were sufficient to prevent the use of the Defective Gree Dehumidifiers by the American and Iowa public, including the Subject Dehumidifier by the Nortons.

**Fines and Civil Penalties**

192. Prior to instituting the criminal actions against Defendants, as well as certain executives who are also under indictment, the U.S. Department of Justice began a civil investigation into the three Gree entities.

193. The civil investigation included allegations that the Defendants a) knowingly failed to report a defect and unreasonable risk of serious injury to the CPSC; b) knowingly made misrepresentations to CPSC staff during its investigation; and c) knowingly sold dehumidifiers bearing the UL safety certification mark knowing that the dehumidifiers did not meet UL flammability standards.

194. On or about March 14, 2016, Gree China, Gree Hong Kong, and Gree USA entered a Settlement Agreement with the CPSC ("CPSC/Gree Settlement Agreement").

195. Pursuant to the CPSC/Gree Settlement Agreement, Gree China, Gree Hong Kong, and Gree USA admitted that they knew that the dehumidifiers were not compliant with the UL flammability standards and sold, offered to sell, distributed in commerce, and imported the dehumidifiers bearing the UL registered safety certification mark despite knowing that said dehumidifiers were not compliant with UL standards and was not authorized by UL in violation of section 19(a)(12) of the CPSA, 15 U.S.C. § 2068 (a)(12).

196. On March 25, 2016, CPSC's Office of General Counsel obtained the provisionally accepted maximum penalty for each violation alleged by the CPSC, and the Gree Defendants hereto agreed to pay a civil monetary penalty of $15,450,000 and to implement a compliance program. This civil penalty is a record settlement, with the Defendants being the first alleged violators of CPSC rules to reach the per violation maximum imposed by the Consumer Product Safety Improvement Act of 2008.

197. Adding the foregoing civil monetary penalty to the criminal fines and penalties the Defendants were previously ordered to pay, the aggregate fines and penalties exceeded $91,000,000 due to their egregious, malicious, wanton, and willful actions

that tragically killed James Norton and other American citizens as a well as damaged and destroyed hundreds of American homes.

## **Willful and Wanton Conduct**

198.    Defendants agreed that individuals who were directly and proximately harmed through physical injury or financial loss by a fire or overheating caused by one of the Defendants' Dehumidifiers were victims of one or more crimes by these Defendants. See "Exhibit 5" ¶¶ 10 & 12.

199.    Ruth and James Norton were such victims of the criminal conduct to which Defendants have admitted.

200.    The Defendants have further admitted that they acted in willful and wanton disregard of Decedent and Plaintiffs' rights in its conduct as described herein above including but not limited to wit:

a.    *No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies **knowingly and willfully failed** immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. (emphasis added) Exhibit 4 ¶ 49.*

201.    The unqualified accuracy and truthfulness of the immediately preceding paragraph has been admitted without qualification by Defendants in the federal criminal proceedings referenced herein above.

202.    As set forth previously, Defendants cannot and:

"they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

See "Exhibit 4" ¶ 42 on Pages 27, 28.

203.    As such and set forth previously, **_ANY_** denial or qualification whatsoever other than an unqualified admission to Paragraphs 198 through 200 above would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein. See "Exhibit 4" ¶ 42 on Pages 27, 28.

204.    Further willful and wanton conduct, acts, and omission are set forth in detail in the preceding factual recitation and following Counts and particulars set forth below which are hereby incorporated by reference as if fully set forth at length.

**COUNT I - STRICT LIABILITY:
DEFECTIVE PRODUCT, NEGLIGENT
MANUFACTURE, and DEFECTIVE DESIGN
(AGAINST ALL DEFENDANTS)**

205.    Plaintiffs hereby incorporate the allegations contained in the proceeding paragraphs as though fully set forth herein at length.

206. The product was manufactured, imported, distributed, marketed, sold, and placed into the stream of commerce in Iowa by the Defendants.

207. The Defendants are manufacturers under Iowa law.

208. The product was in a dangerous and defective condition.

209. The Defendants actions and the dangerous and defective condition caused the product to be unreasonably dangerous to consumers and users, including Plaintiffs, when used in a reasonable manner.

210. The Defendants were engaged in the business of manufacturing the product.

211. The Subject Dehumidifier was expected to and did reach consumers in Iowa, including Plaintiffs, as expected by Defendants without substantial or other changes.

212. The defect and danger posed thereby as described herein was a cause of the fire, the death of James Norton, and the other injuries and damages to Plaintiffs.

213. The Nortons used the Subject Dehumidifier in a reasonable and reasonably foreseeable manner as intended by the Defendants.

214. The conduct of Defendants and the Subject Dehumidifier was unreasonably dangerous in the following particulars:

a. It was designed and manufactured in such a way as to cause malfunction, overheat, and ignite a fire;

b. It was designed and manufactured with defective plastic parts that were not adequate, proper, or sufficient to withstand the temperatures and heat created by the Subject Dehumidifier and therefore was prone and unreasonably susceptible to igniting a fire;

44

c.  It failed to remove humidity or otherwise perform its designed functions in a safe manner as would be expected by the ordinary consumer;

d.  It lacked adequate safety features or safeguards to prevent the Subject Dehumidifier from igniting a fire at the Subject Property;

e.  Defendants failed to properly inspect and test the Subject Dehumidifier to protect against a fire hazard;

f.  Defendants failed to properly inspect and test the Subject Dehumidifier to ensure that it was safe and not unreasonably dangerous when used in the expected way an ordinary consumer would use it;

g.  The Subject Dehumidifier was constructed with plastic insufficient to withstand temperatures that could be achieved and expected with foreseeable use of this product;

h.  The Subject Dehumidifier was designed, manufactured, marketed, distributed, and sold for the purpose of reducing humidity in a residential setting, though it had been manufactured and designed with materials, which were inadequate for such a purpose, and which presented a fire hazard;

i.  The Subject Dehumidifier was labeled, marketed, distributed, supplied, and sold for the purpose of reducing humidity in a residential setting even though it was unsafe and unreasonably dangerous when used for this intended purpose;

j.  The Subject Dehumidifier was designed and manufactured without adequate warning to the intended users that it posed a fire risk when used for the intended purpose of reducing humidity in a residential setting;

45

k. The Subject Dehumidifier was designed and manufactured in such a way as to cause overheating at the control panel within the product that posed a risk of fire when used for the intended purpose of reducing humidity in a residential setting;

l. The Subject Dehumidifier was otherwise defective and unreasonably dangerous it its design, manufacture, assembly, and with respect to its warning;

m. The Subject Dehumidifier's control device that was intended to turn off power to the machine when it achieved an unsafe temperature failed to adequately perform its function, such that the dehumidifier overheated and started on fire;

n. The Subject Dehumidifier, including the defective plastic parts and defective design, were not remedied before it left the factory, was distributed, and was placed into the stream of commerce and reached consumers in Iowa;

o. By, otherwise, not comporting to the applicable standards of care in designing, manufacturing, testing, inspecting, distributing, selling, and recalling the Defective Gree Dehumidifiers, including the Subject Dehumidifier, without properly ensuring appropriate quality assurance and quality control procedures were followed, without requiring business partners to demonstrate the safety of potentially dangerous products, and for failing to conduct any independent testing on the product peddled by Defendants to thousands of customers in Iowa and throughout the United States; and/or

p. In failing to act as a reasonable designer, manufacturer, tester, investigator, inspector, sourcer, importer, distributor, seller, recaller, and consumer product company given the circumstances existing at all times material hereto.

215. The conduct, acts, and omissions of Defendants and the dangerous and defective condition of the Subject Dehumidifier were a cause of the fire, James Norton's death, and Plaintiffs' other injuries, damages, and loss.

216. Defendants, including MJC America and MJC Holdings, held themselves out as the actual manufacturer of the Subject Dehumidifier by branding the product with their marks and, as such, are manufacturers of the product under Iowa Law and the apparent manufacturer doctrine.

217. At all times material hereto, including the time of design, manufacturing, and sale of the Subject Dehumidifier, the Defendants, had actual knowledge that it was unreasonably dangerous and defective.

218. Defendants' conduct was a cause of the death of James Norton resulting in the following damages to the Plaintiffs:

   a. Pre-death pain and suffering;

   b. Pre-death loss of full use of mind and body;

   c. Loss of the opportunity to survive;

   d. Loss of accumulation of the Estate;

   e. Past and future Medical and related expenses;

   f. Present value of the loss of the interest and expense on the premature burial of James Norton;

   g. Past and Future Loss of consortium, services, and support;

   h. Past and Future physical and mental pain and suffering of Ruth Norton;

   i. Past and Future loss of full use of mind and body, physical impairment, and disability of Ruth Norton;

j.   Property Damage;

k.   Punitive and exemplary damages; and

l.   Other damages as allowed by law.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT II - NEGLIGENCE:
### DEFECTIVE PRODUCT, NEGLIGENT MAUNFACTURE, DEFECTIVE DESIGN, FAILURE TO WARN, and ORDINARY NEGLIGENCE
### (AGAINST ALL DEFENDANTS)

219.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

220.   The Defendants owed a duty to the general public and consumers, including the Nortons, to use reasonable care in designing, sourcing, testing, inspecting, marketing, distributing, selling, and placing into the stream of commerce and American homes their dehumidifiers, and Defendants had a duty to protect the Nortons from foreseeable and unreasonable risk of harm.

221.   Defendants breached this duty and were negligent in one or more of the following particulars:

a.   By designing and manufacturing the Subject Dehumidifier in such a way as to cause malfunction and ignite a fire;

b.   By designing and manufacturing the Subject Dehumidifier with defective plastic parts that were not adequate, proper, or sufficient to withstand the

temperatures and heat created by the Subject Dehumidifier and which was therefore prone to ignite a fire;

c.  By designing and manufacturing the Subject Dehumidifier to not remove humidity in a safe manner as would be expected by the ordinary consumer;

d.  By designing and manufacturing the Subject Dehumidifier in a manner that it lacked adequate safety features or safeguards to prevent the Subject Dehumidifier from igniting a fire at the Subject Property;

e.  By failing to properly inspect and test the Subject Dehumidifier to protect against a fire hazard;

f.  By failing to properly inspect and test the Subject Dehumidifier to ensure that it was safe and not unreasonably dangerous when used in the expected way by how an ordinary consumer would use it;

g.  By designing and manufacturing the Subject Dehumidifier in the manner it was constructed with plastic insufficient to withstand temperatures that could be achieved and expected with foreseeable use of this product;

h.  By improperly labeling, marketing, distributing, supplying, and selling the Subject Dehumidifier for the purpose of reducing humidity in a residential setting even though it was unsafe, unreasonably dangerous, and defective when used for this intended purpose;

i.  By designing, manufacturing, labeling, marketing, distributing, supplying, and selling the Subject Dehumidifier without adequate warning to the intended users that it posed a fire risk when used for the intended purpose of reducing humidity in a residential setting;

49

j.  By designing and manufacturing the Subject Dehumidifier in such a way as to cause overheating at the control panel within the product that posed a risk of fire when used for the intended purpose of reducing humidity in a residential setting;

k.  By designing, manufacturing, labeling, marketing, distributing, supplying, and selling the Subject Dehumidifier that was otherwise defective and unreasonably dangerous in its design, manufacture, assembly, and with respect to its warning;

l.  By designing and manufacturing the Subject Dehumidifier's control device that should turn off power to the machine when it achieved an unsafe temperature, but which failed to perform its function adequately or otherwise properly, such that the dehumidifier overheated and started on fire;

m.  By designing and manufacturing the Subject Dehumidifier with defective plastic parts and defective design that were not remedied before it left the factory, was distributed, was placed into the stream of commerce, and able to reach consumers in Iowa;

n.  By failing to warn consumers in the United States, including Iowa and including the Nortons, of the dangerous and defective condition of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically;

o.  In covering up the dangerous and defective condition of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically;

p.  In failing to report the dangerous and defective condition of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically to the CPSC and the public in general;

50

q.  In misrepresenting, and the improper and unlawful use of the purported UL certification of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically to consumers, including Plaintiffs;

r.  In committing the criminal conduct for which Defendants and its agents were charged, including but not limited to, that conduct which was admitted;

s.  In failing to timely and properly recall and take all necessary steps required of a proper recall of a dangerous product with respect to the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically;

t.  In failing to timely and properly issue a "stop sale" of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically;

u.  In failing to properly and timely remove the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically from the stream of commerce;

v.  In failing to take steps to timely and properly ensure notification and disclosure to consumers, including the Plaintiffs, of the grave danger posed by the Defective Gree Dehumidifiers in general and the Subject Dehumidifier specifically;

w.  In failing to reasonably conduct the recall process in a manner that comports with the applicable standard of care for designer, manufacturers, testers, investigators, inspectors, sourcers, importers, distributors, sellers, and/or consumer product companies such that the Subject Dehumidifier remained in the Subject Property and a grave danger to the Plaintiffs;

x.   In failing to notify of the danger and/or ensure removal of the Subject Dehumidifier from the Plaintiffs' home and/or the stream of commerce during or before the recall and prior to the fire and James Norton's death;

y.   By, otherwise, not comporting to the standard of care in sourcing, testing, inspecting, distributing, selling, and recalling Defective Gree Dehumidifiers, including the Subject Dehumidifier, without properly ensuring appropriate quality assurance and quality control procedures were followed, without requiring business partners to demonstrate the safety of potentially dangerous products, and for failing to conduct any independent testing on the product peddled by Defendants to thousands of customers in Iowa and throughout the United States; and/or

z.   In failing to act as a reasonable designer, manufacturer, tester, investigator, inspector, sourcer, importer, distributor, seller, recaller, and consumer product company given the circumstances existing at all times material hereto.

222.   Defendants' conduct, acts, omissions, and negligence were a cause of the fire, James Norton's death, and the other injuries, damages, and loss herein set forth above.

223.   Plaintiffs suffered damages and losses as set forth herein previously in detail and which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

52

## COUNT III - NEGLIGENCE PER SE
### (AGAINST ALL DEFENDANTS)

224.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

225.   The Defendants owed a duty to the general public and consumers, including the Nortons, to use reasonable care in complying with all applicable laws, regulations, ordinances, codes, statutes, rules, and other industry standards in the designing, sourcing, testing, inspections, marketing, distribution, selling, and placing into the stream of commerce and American homes their dehumidifiers.

226.   Defendants breached this duty and were negligent in one or more of the following particulars:

   a.   In violating the CPSA including but not necessarily limited to 15 U.S.C. § 2064(b) (3) and (4) in violation of, Title 15, United States Code, Sections 2068 (a) (4) and 2070;

   b.   In violating UL 474 and 94;

   c.   Iowa Code § 554.2314 Merchantable Goods Statute;

   d.   Iowa Code § 714.16 Consumer Fraud Statute; and/or

   e.   Other applicable laws, regulations, ordinances, codes, statutes, rules, and other industry standards.

227.   Defendants' conduct, acts, omissions, negligence, and violation of applicable laws, regulations, ordinances, codes, statutes, rules, and other industry standards were a cause of the fire, James Norton's death, and the other injuries, damages, and losses herein set forth above.

228.     Plaintiffs suffered damages and losses as set forth herein previously in detail and
which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and
compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for
interest at the statutory rate, and for the costs of this action.

## COUNT IV - FRAUD
## (AGAINST ALL DEFENDANTS)

229.     Plaintiffs hereby incorporate by reference the allegations herein contained in the
proceeding paragraphs as though fully set forth.

230.     Defendants made representations to Iowa consumers, including Plaintiffs, about the
Defective Gree Humidifiers in general and the Subject Dehumidifier including the
following:

    a.   They were safe to use for their intended use and purpose;

    b.   They met all applicable UL Standards;

    c.   They did not burn when overheated;

    d.   They did not pose a substantial product hazard;

    e.   They did not pose a significant fire risk or danger to American consumers
including Iowans;

    f.   They did not need to be recalled for the safety of American consumers including
Iowans; and/or

    g.   They could be safely purchased, placed in American and Iowan homes, and
turned on.

231.     The statements were false.

232. The statements were material, relevant, and important.

233. The statements were made intentionally and with scienter.

234. The Defendants had the intent to deceive.

235. The CPSC, American public, and consumers, including Iowans and the Plaintiffs, relied upon the false statements and representations.

236. Defendants' fraudulent conduct, statements, misrepresentations, acts, and omissions were a cause of the fire, James Norton's death, and the other injuries, damages, and losses herein set forth above.

237. Plaintiffs suffered damages and losses as set forth herein previously in detail and which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT V- FRAUDULENT CONCEALMENT
### (AGAINST ALL DEFENDANTS)

238. Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

239. Defendants had superior knowledge and access thereto compared to other Parties and third parties of the true and dangerous condition of the Defective Gree Dehumidifiers in general and the Subject Dehumidifier in particular including the following:

a. *No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1)*

55

*contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies knowingly and willfully failed immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. Exhibit 4 ¶ 49.*

240.    The unqualified accuracy and truthfulness of the immediately preceding paragraph has been admitted without qualification by Defendants in the federal criminal proceedings referenced herein above.

241.    As set forth previously, Defendants cannot and:

"they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

See "Exhibit 4" ¶ 42 on Pages 27, 28.

242.    As such and set forth previously, **ANY** denial or qualification whatsoever other than an unqualified admission to Paragraph 239 above would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein. See "Exhibit 4" ¶ 42 on Pages 27, 28.

243.    The above referenced withholding, concealment, and suppression of information was of material facts by the Defendants who were the Parties with the superior knowledge.

244.   The CPSC, American public, and consumers, including Iowans and the Plaintiffs, who were less experienced and/or less informed than Defendants relied upon the lack of information about the danger posed by the dehumidifiers.

245.   Defendants' fraudulent concealment, withholding, suppression of information, and other acts and omissions were a cause of the fire, James Norton's death, and the other injuries, damages, and losses herein set forth.

246.   Plaintiffs suffered damages and losses as set forth herein previously in detail and which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT VI - BREACH OF IMPLIED WARRANTY OF FITNESS
### (AGAINST ALL DEFENDANTS)

247.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

248.   Defendants had reason to know the particular purpose for which the Subject Dehumidifier was to be used. Defendants had reason to know that consumers, including Plaintiffs, were relying on the skill and judgment of the Defendants to design, manufacture, inspect, test, market, select, sell, and furnish suitable and safe products.

249.   The product supplied by Defendants was unfit for the particular purpose for which it was designed, manufactured, inspected, tested, marketed, selected, sold, furnished, and purchased.

250. Defendants' breaches of implied warranty of fitness and the products lack of fitness for its purpose were a cause of the fire, James Norton's death, and Plaintiffs' injuries, damages, and losses herein set forth.

251. Defendants are liable to Plaintiffs for breach of implied warranty of fitness.

252. Plaintiffs suffered damages and losses as set forth herein previously in detail and which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT VII - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (AGAINST ALL DEFENDANTS)

253. Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

254. The Subject Dehumidifier was subject to an implied warranty of merchantability under Iowa Law, which was not excluded or modified and could not lawfully be excluded or modified.

255. The Subject Dehumidifier did not comply with the warranty of merchantability because it was unfit for the ordinary purpose for which dehumidifiers were used, as demonstrated by the fact that the Subject Dehumidifier was recalled.

256. Defendants' breaches of implied warranty and other acts and omissions were a cause of the fire, James Norton's death, and Plaintiffs' injuries, damages, and losses set forth herein.

257. Defendants are liable to Plaintiffs for breach of the implied warranty of merchantability.

258. Plaintiffs suffered damages and losses as set forth herein previously in detail and which are hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT VIII – BREACH OF EXPRESS WARRANTY
### (AGAINST ALL DEFENDANTS)

259. Plaintiffs incorporate herein by reference the allegations contained in the proceeding paragraphs as though fully set forth.

260. Defendants designed, manufactured, assembled, installed, sold, distributed, and introduced into the stream of commerce the Subject Dehumidifier in the ordinary course of its business.

261. Defendants represented that the Subject Dehumidifier was in good working order and was fit for use as a dehumidifier.

262. The aforesaid representations were material factors in inducing the Plaintiffs to acquire the Subject Dehumidifier.

263. The Subject Dehumidifier did not conform to the aforesaid representations, in that, among other things, the Subject Dehumidifier was designed, manufactured, sold, assembled, distributed, and introduced into the stream of commerce by Defendants as defective and unreasonably dangerous.

264.   The aforesaid non-conformities caused the Subject Dehumidifier to fail, allowing it to catch on fire so that Plaintiffs were not able to use the Subject Dehumidifier in a reasonable manner.

265.   Defendants were notified of said nonconformities.

266.   Defendants' conduct, acts, omissions, and breach of express warranty was a cause of the fire, James Norton's death, and the other injuries, damages, and losses herein set forth.

267.   Plaintiffs suffered damages and losses as set forth herein previously in detail and which is hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

**COUNT IX - NEGLIGENT INFLICTION OF
EMOTIONAL DISTRESS/BYSTANDER CLAIM
(AS TO PLAINTIFF RUTH NORTON AGAINST ALL DEFENDANTS)**

268.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

269.   Ruth Norton was located in the home and thus at and near the scene of the fire.

270.   She suffered severe emotional distress and direct emotional impact from her location in the home and her proximity to her husband as he suffered fatal injuries and death from the fire.

271.   Ruth Norton was the wife of the Decedent, her husband, James Norton.

272.   Ruth Norton reasonably and correctly believed that she and her husband, James Norton, would likely be seriously injured and die.

273.   Her emotional distress was severe and serious.

274.   Defendants' conduct, acts, omissions, and negligence were a cause of the fire, James Norton's death, and the other injuries, damages, and losses herein set forth above.

275.   Plaintiffs suffered damages and losses as set forth herein previously in detail and which is hereby incorporated by reference as if set forth fully at length.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT X - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST ALL DEFENDANTS)

276.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

277.   The Defendants conduct as set forth herein above and admitted by Defendants was outrageous.

278.   The Defendants thereby acted with reckless disregard of the probability of causing severe emotional distress.

279.   Plaintiffs suffered severe emotional distress as a result.

280.   The Defendants' outrageous conduct, acts, and omissions were a cause of the severe fire, James Norton's death, and their emotional distress and damages.

281.   Plaintiffs suffered emotional distress and the damages and losses as set forth herein previously in detail and which is hereby incorporated by reference.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT XI - LOSS OF CONSORTIUM
### (AS TO PLAINTIFF RUTH NORTON AGAINST ALL DEFENDANTS)

282.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

283.   Plaintiff Ruth Norton and Plaintiff Decedent James Norton are and were married and at all times material hereto husband and wife.

284.   Plaintiff Ruth Norton has been deprived and suffered the loss of, and hereby makes claims for past and future expenses and actual loss of services, society, companionship, comfort, love, aid, affection, attention, guidance, and all other loss related to the loss of relationship and consortium of her spouse.

285.   The conduct, acts, omissions as described herein above were and are a cause of the damages sustained by Plaintiff Ruth Norton.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## COUNT XII - PUNITIVE DAMAGES
### (AGAINST ALL DEFENDANTS)

286.   Plaintiffs hereby incorporate by reference the allegations herein contained in the proceeding paragraphs as though fully set forth.

287.   Defendants acted in willful and wanton disregard of Decedent and Plaintiffs' rights in its conduct as described herein above.

288.  The Defendants have admitted that their conduct was knowing and willful including but not limited to wit:

   b.  *No later than September 19, 2012, each of the Gree Companies had information which reasonably supported the conclusion that their Gree dehumidifiers: (1) contained defects which created a substantial product hazard, that is, a substantial risk of injury to the public; and (2) created an unreasonable risk of serious injury or death. After learning this information, each of the Gree Companies **knowingly and willfully failed** immediately to inform the United States Consumer Product Safety Commission about these dangerous defects in their Gree dehumidifiers or the dangerous risks posed by their Gree dehumidifiers. (emphasis added) Exhibit 4 ¶ 49.*

289.  The unqualified accuracy and truthfulness of the immediately preceding paragraph has been admitted without qualification by Defendants in the federal criminal proceedings referenced herein above.

290.  As set forth previously, Defendants cannot and:

   "they shall not, through their present or future attorneys, officers, directors, agents, management level employees, or any other person authorized to speak for them, make any public statement, in litigation or otherwise, contradicting in whole or in part the facts described in the Statement of Facts attached to this agreement in Exhibit B."

   See "Exhibit 4" ¶ 42 on Pages 27, 28.

291.  As such and set forth previously, **ANY** denial or qualification whatsoever other than an unqualified admission to Paragraphs 287 and 288 above would constitute a breach of Gree China and Gree Hong Kong's Deferred Prosecution Agreement and

would be a direct violation of its obligation to refrain from making any statement contradicting its admissions therein.  See "Exhibit 4" ¶ 42 on Pages 27, 28.

292.    Accordingly, Plaintiffs are entitled to punitive and exemplary damages from Defendants.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants for actual and compensatory damages in a fair and reasonable amount, punitive and exemplary damages, for interest at the statutory rate, and for the costs of this action.

## <u>JURY DEMAND</u>

**Plaintiffs demand a jury trial of all the issues raised and presented in this Petition.**

Respectfully submitted,

*GOURLEY, REHKEMPER & LINDHOLM, PLC*

Cory F. Gourley, AT0002966
440 Fairway Drive, Suite 210
West Des Moines, IA 50266
Telephone: (515) 226-0500
Facsimile: (515) 244-2914
Email: cfgourley@grllaw.com

*NORRIS INJURY LAW GROUP, PLC*

/s/ *Michael T. Norris*
Michael T. Norris, AT0005909
1200 Valley West Drive, Suite 606
West Des Moines, Iowa 50266
Telephone: (515) 310-1460
Facsimile: (515) 957-2211
Email: mnorris@norrisinjurylawgroup.com

**ATTORNEYS FOR PLAINTIFFS**

Original Filed.